115 T.C. No. 34


UNITED STATES TAX COURT


DONALD DECLEENE AND DORIS DECLEENE, Petitioners
<u>v</u>. COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24459-97.                    Filed November 17, 2000.


        P had operated his business on the M Street
property since 1977.  In 1992, P purchased the
unimproved L Drive property as replacement property.
In September 1993, P and WLC, who wished to acquire M
Street, agreed that M Street and unimproved L Drive
were of equal value, $142,400; P quitclaimed title to L
Drive to WLC for a deferred cash consideration of
$142,400, to be paid at a second closing; WLC agreed to
build a building on L Drive to P's specifications and
in December 1993 to reconvey L Drive to P, with the
substantially completed building on it, in exchange for
M Street.  These transactions closed as agreed.  While
WLC held title to L Drive, P retained beneficial
ownership thereof and was responsible for all
transaction costs and carrying charges.  Construction
was financed by a note and mortgage guaranteed by P
that were nonrecourse as to WLC, and P assumed personal

liability for them at the second closing, when WLC paid P the cash consideration of $142,400.

Held:  The subject transactions were a sale of M Street to WLC for $142,400, as determined by R, rather than a sale of unimproved L Street, followed by a reverse like-kind exchange of M Street for improved L Street under sec. 1031(a), I.R.C., as reported by P. Because P never divested himself of beneficial ownership of L Street, P could not acquire improved L Street as replacement property in exchange for his relinquishment of M Street to WLC.  Held, further, P is not liable for the accuracy-related penalty under sec. 6662(a), I.R.C.

Brian R. Mudd, for petitioners.

Michael J. Calabrese, for respondent.

BEGHE, Judge:  Respondent determined for the taxable year 1993 that petitioners had a Federal income tax deficiency of $23,796 and were liable for a section 6662(a)[1] accuracy-related penalty of $4,759.

The sole substantive issue for decision is whether the subject transactions qualified as a taxable sale of the Lawrence Drive property and a like-kind section 1031(a)(1) exchange of the McDonald Street property, as petitioners reported them, or was a taxable sale of the McDonald Street property, as respondent

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

determined. We uphold respondent's determination that the transactions resulted in a sale of the McDonald Street property, but we hold for petitioners on the penalty issue.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulations of fact and the accompanying exhibits are incorporated herein by this reference. Petitioners are husband and wife who resided in Green Bay, Wisconsin, at the time they filed their petition.

Since 1969, petitioner Donald DeCleene (petitioner) has owned and operated a trucking/truck repair business. In 1976 and 1977, petitioner purchased improved real property located on McDonald Street, Green Bay (the McDonald Street property). He used the McDonald Street property for his business operations.

In 1993, petitioners owned and worked as employees of DeCleene Truck Repair and Refrigeration, Inc. (Refrigeration). Petitioner served as president. Refrigeration installs and repairs truck refrigeration units and performs general truck repairs. Through December 29, 1993, Refrigeration rented the McDonald Street property from petitioner as its business premises. Petitioner computed his adjusted basis for the McDonald Street property, including the depreciated cost of improvements, as being $59,831 at the time he disposed of that property on December 29, 1993.

In 1992, petitioner was looking for land to which he could move his business.

On September 30, 1992, petitioner purchased 8.47 acres of unimproved real property on Lawrence Drive in De Pere, Wisconsin (the Lawrence Drive property), a suburb of Green Bay. Petitioner described the Lawrence Drive property as a "very good spot" that he "took advantage of". Petitioner promptly sold 2.09 acres of the Lawrence Drive property to an unrelated corporation. Petitioner's adjusted basis of the Lawrence Drive property that he purchased and retained, with allocated fees and other closing costs, was $137,027.

Petitioner partially financed the purchase of the Lawrence Drive property with a $100,000 loan from Bank One, Green Bay. Bank One, Green Bay received petitioner's note and a mortgage on the Lawrence Drive property as security for its loan.

By 1993, petitioner was ready to move his business to a new building to be constructed on the Lawrence Drive property.

After petitioner acquired the Lawrence Drive property, The Western Lime and Cement Co. (WLC) expressed interest in acquiring petitioner's McDonald Street property.

Petitioner discussed WLC's interest in the McDonald Street property with his accountant. The accountant suggested that petitioner could structure a like-kind exchange in which he would quitclaim the Lawrence Drive property to WLC, after which WLC

would convey back to petitioner the Lawrence Drive property with a new building built thereon to petitioner's specifications, in exchange for the McDonald Street property.

On September 24, 1993, WLC made an offer--prepared by petitioner's attorney--which petitioner accepted, to purchase the Lawrence Drive property for $142,400; petitioner's acceptance contained an undertaking to "transfer building permit to Buyer on or before September 27, 1993".[2]  On September 24, 1993, petitioner quitclaimed title to the Lawrence Drive property to WLC, and WLC gave petitioner a fully nonrecourse noninterest bearing one payment note and mortgage on the Lawrence Drive

---

[2] The copy of the building permit included as Exhibit 39-J in paragraph 67 of the Supplemental Stipulation of Facts replaces paragraph 30 of the Stipulation of Facts, which stated as follows:  "Prior to his September 24, 1993 quit claim of title to the Lawrence Drive property to the Western Lime & Cement Co., a permit was obtained in Donald DeCleene's name for construction of a building on the Lawrence Drive property".

Exhibit 39-J is a photocopy that bears a variety of dates: it was originally submitted to and preliminarily approved by the City of DePere Building Inspector on July 29, 1993; it bears the signature of the "Owner/Agent Michael DeCleene V.P. Date 1/12/94"; it was recorded "10/22/93" and bears the notation, "Site Plan approved by Plan Commission on 4-27-93".  The name of petitioner as Owner, his mailing address, and telephone number appear on the line of the permit form provided for that information.  However, the name, mailing address, and telephone number of WLC have been written in above those of petitioner.

On July 29, 1993, Green Bay Abstract & Title Company, Inc. (the title company), had issued a title commitment with WLC as the proposed insured on the owner's policy in the insured amount of $142,400 and Bank One, Green Bay as the proposed insured on the loan policy in the insured amount of $522,400.

property in the amount of $142,400.  On that same day, petitioner assigned to Bank One, Green Bay, the WLC $142,400 note and mortgage.  The WLC $142,400 note was due by its terms "upon the closing of an exchange transaction between" WLC and petitioner, or 6 months from the date of the note, "whichever is earlier".

On September 24, 1993, WLC and petitioner also executed the Exchange Agreement regarding the McDonald Street property and the Lawrence Drive property.  The Exchange Agreement was drafted by petitioner's attorney with input from WLC's attorney.

Paragraph 1 of the Exchange Agreement required petitioner to convey by warranty deed the McDonald Street property to WLC, "free and clear of all liens and encumbrances", in exchange for WLC's paying its $142,400 note to petitioner and conveying the Lawrence Drive Property back to petitioner by quitclaim deed.

Paragraph 2 of the Exchange Agreement provided that petitioner would pay all costs relating to the transfers of the McDonald Street and Lawrence Drive properties.

In Paragraph 4 of the Exchange Agreement, petitioner made comprehensive warranties to WLC with respect to the McDonald Street property, but WLC expressly disavowed making any warranties to petitioner with respect to the Lawrence Drive property.

The Exchange Agreement provided that WLC would construct a building on the Lawrence Drive property to petitioner's specifications.

The Exchange Agreement provided that petitioner at the closing of the exchange would pay an amount representing the costs of the building on the Lawrence Drive property, as well as insurance premiums, real estate taxes, interest, and all other "soft" costs WLC might incur incident to the construction of the building.

Petitioner in the Exchange Agreement agreed to indemnify and hold WLC harmless against any damages sustained or incurred in connection with the construction and financing of the Lawrence Drive property.

Petitioner and WLC intended to close on the Exchange Agreement upon completion of construction of the building on the Lawrence Drive property "but not later than December 31, 1993".

Bank One, Green Bay provided financing for the construction of the building on the Lawrence Drive property.  On September 24, 1993, Bank One, Green Bay agreed to a construction loan of $380,000, naming WLC as borrower and petitioner as guarantor. This loan was nonrecourse as to WLC.  On the same day WLC executed a note and mortgage to Bank One, Green Bay, which provided that WLC had no personal liability on the note secured by the mortgage and that the lender would look solely to the

Lawrence Drive property securing the mortgage; petitioner guaranteed the $380,000 construction loan.

Bank One, Green Bay considered petitioner the source of repayment of the September 24, 1993, $380,000 construction loan. In connection with that loan, Bank One, Green Bay never obtained any financial statements from WLC. The check of the creditworthiness of WLC by the Bank One, Green Bay loan officer consisted of calling a branch bank to discuss WLC's business reputation.

The $380,000 note for the September 24, 1993 Bank One, Green Bay construction loan required no interest or principal payments during the time that WLC was expected to be the named borrower on the note; the note did not require payment of interest until March 23, 1994.

On September 24, 1993, the following other events occurred: Petitioner gave Bank One, Green Bay a new mortgage on the McDonald Street property securing a total obligation of $480,000, consisting of both his September 30, 1992, $100,000 note and the WLC nonrecourse note of $380,000 that he had guaranteed; WLC accepted the commitment of Bank One, Green Bay to provide a $380,000 loan for financing construction of the building on the Lawrence Drive property; WLC executed a corporate borrowing resolution authorizing it to borrow from Bank One, Green Bay; WLC executed an application to Bank One, Green Bay for a standby

letter of credit in the amount of $380,000 in favor of the title company, which was delegated the task of making progress payments to the contractor under the construction contract; the bank issued its irrevocable standby credit in favor of the title company in that amount.

On September 24, 1993, Landmark Building Systems Ltd. (Landmark) entered into a lump sum construction contract in the amount of $375,688 (subject to certain adjustments) with WLC to construct the building on the Lawrence Drive property. The contract named petitioner, Mike DeCleene (petitioners' son, who works in the family business), and/or a representative of Excel Engineering, as owner's representative. As owner's representative, petitioner and Mike DeCleene had general authority, including the right to approve changes in design or construction, to inspect and approve workmanship and materials, to visit the construction site, and to determine compliance with the contract.

Although the standby letter of credit and the construction contract do not expressly so state, progress payments to the contractor were to be made only with the approval of petitioner or Michael DeCleene as owner's representative. Excel Engineering played a role in the design of the building, but lacked actual authority to sign off as owner's representative.

The construction contract called for substantial completion by December 15, 1993. Between September 24 and December 29, 1993, Landmark worked on the construction of the building on the Lawrence Drive property and substantially completed the building to petitioner's specifications.

On December 28, 1993, 1 day prior to execution and closing of the Assumption, Release and Escrow Agreement described below, Bank One, Green Bay executed a Satisfaction of Mortgage for the mortgage given by WLC to petitioner that petitioner had assigned to the bank in connection with petitioner's quitclaim of the Lawrence Drive property to WLC on September 24, 1993.

On December 29, 1993, Bank One, Green Bay, WLC, and petitioner executed the Assumption, Release and Escrow Agreement, which provided that petitioner assumed and became personally obligated to the bank for all obligations of WLC arising out of the construction note and mortgage, notwithstanding their nonrecourse language; petitioner agreed to be responsible for completion of the construction project; and WLC agreed to pay petitioner $142,400 for the McDonald Street property. Petitioner undertook to use $100,000 of the $142,400 received from WLC "to pay a Note due the Bank in the amount of * * * $100,000" (which had been secured by mortgages on both the Lawrence Drive property and the McDonald Street property) and to escrow the remainder with the bank to pay real estate taxes and any special

assessments on the McDonald Street property and to reduce the balance of the construction loan note and mortgage to $360,000, with any surplus of the escrowed funds to be delivered to petitioner.  Bank One, Green Bay agreed "to release any liens that it may have on the property located on McDonald Street".

On December 29, 1993, petitioner formally assumed as borrower what had been WLC's nonrecourse $380,000 Bank One, Green Bay note of September 24, 1993; petitioner conveyed the McDonald Street property to WLC by warranty deed.  WLC quitclaimed to petitioner its interest in the Lawrence Drive property.  WLC directly paid petitioner $142,400 by check to petitioner's order drawn on M&I First National Bank of West Bend, Wisconsin. Petitioner endorsed this check "Pay only to the order of Bank One-Green Bay".

Petitioner and WLC had agreed in the Exchange Agreement that the McDonald Street property, including improvements, and the unimproved Lawrence Drive property each had a value of $142,400. The quitclaim deed of the Lawrence Drive property from petitioner to WLC and the warranty deed of the McDonald Street property from petitioner to WLC each showed that real estate transfer tax of $427.20 had been paid, based on a value of $142,400; the quitclaim deed from WLC to petitioner of the title to the

improved Lawrence Drive property showed that real estate transfer tax of $1,140 had been paid, based on a value of $380,000.[3]

Although petitioner had a general desire to complete his acquisition of the improved Lawrence Drive property as soon as possible, he didn't particularly care whether the closing occurred before or after December 31, 1993. WLC wished to have the closing occur before December 31, 1993, because it wanted the Lawrence Drive property removed from its books for insurance valuation purposes before the end of the year.

On their 1993 return, petitioners treated the subject transactions between petitioner and WLC as a sale of the unimproved Lawrence Drive property and a like-kind exchange of the McDonald Street property for the improved Lawrence Drive property. Petitioners reported no gain or loss on the disposition of the McDonald Street property. They reported a $5,373 short-term capital gain ($142,400 gross "sales price" less $137,027 basis) on their quitclaim transfer of the Lawrence Drive property to WLC, which is described in Schedule D of their return as a sale of "investment land".

---

[3] Although these amounts do not computationally coincide in all respects with the transfer tax figures shown on the buyer's and seller's closing statements, those statements confirm that the transfer taxes on the subject transactions were paid by petitioner.

Petitioners' 1993 return includes a Form 8824, Like-Kind Exchanges, which states that petitioners exchanged "land and building" for "land and building". The return discloses no other facts regarding the transactions between petitioner and WLC.

Respondent used petitioner's $59,831 adjusted basis figure for the McDonald Street property in computing the long-term capital gain on the sale of the McDonald Street property determined in the deficiency notice. However, on audit of petitioners' return, an adjusted basis of $61,331 had been established. Respondent's deficiency notice did not back out the gain petitioners had reported on petitioner's quitclaim transfer of the unimproved Lawrence Drive property to WLC, notwithstanding that, under respondent's theory of the case, the Lawrence Drive property has never been disposed of by petitioner.

On April 29, 1998, Bank One, Green Bay, WLC, and petitioner executed an amendment to the Assumption, Release and Escrow Agreement. The amendment recites that the original of that agreement contained a scrivener's error, and recites that WLC would pay petitioner $142,400 "in satisfaction of the Note and Mortgage" on the Lawrence Drive property, that the Lawrence Drive Property "is exchanged per the Exchange Agreement" for the McDonald Street property, that petitioner will use $100,000 of the $142,400 received from WLC to pay petitioner's $100,000 note

to the bank, and that the balance of $42,400 will be escrowed with the bank to pay real estate taxes and any special assessments on the <u>Lawrence Drive property</u> (emphases supplied) and to reduce the balance of the construction loan and mortgage to $360,000.

The amendment also sets forth a revision of the provision regarding release of liens by Bank One, Green Bay, reading as follows:

> The Bank agrees to release any liens that it may have on the property located at 625 Lawrence Drive, De Pere, Wisconsin, that are the obligation of the Company [WLC] and against 917 MacDonald [sic] Street, Green Bay, Wisconsin that are the obligation of DeCleene.

The terms of the foregoing transactions among WLC and petitioner and Bank One, Green Bay assured that WLC would pay no amounts thereunder until it received the McDonald Street property, that WLC would have no personal liability with respect to the Lawrence Drive property or financing while the Lawrence Drive property was titled in its name or at any time thereafter, and that all transaction and other costs with respect to the McDonald Street and Lawrence Drive properties would be paid by petitioner.

## OPINION

Section 1001(c) provides that the entire gain or loss on the sale or exchange of property shall be recognized.  Section

1031(a)(1) provides for nonrecognition of gain or loss on the exchange of certain types of like-kind property, including real property, held for productive use in trade or business or for investment.[4]  Section 1031(b) in effect provides that if the property received in an exchange otherwise qualifying for nonrecognition of gain under section 1031(a) includes money or other property ("boot"), then any gain to the recipient shall be recognized, but not in excess of the boot.

Was McDonald Street Sold or Exchanged?

The question posed by respondent's determination is whether the subject transactions were a taxable sale to WLC of the McDonald Street property, as respondent determined, or instead were a taxable sale of the unimproved Lawrence Drive property to WLC, followed 3 months later by petitioner's transfer of the McDonald Street property to WLC in a like-kind exchange for WLC's

---

[4] Clearly, the Lawrence Drive property, in both its unimproved and improved states, and the McDonald street property were like-kind properties within the meaning of sec. 1031(a). Sec. 1.1031(a)-1(b), Income Tax Regs., states:

Definition of "like kind."  As used in section 1031(a), the words "like kind" have reference to the nature or character of property and not to its grade or quality.  * * * The fact that any real estate involved is improved or unimproved is not material, for that fact relates only to the grade or quality of the property and not to its kind or class. * * *

reconveyance to petitioner of the Lawrence Drive property--now substantially improved--as petitioners reported.

The tax significance of the answer to the question stems from the disparity in the adjusted bases of the McDonald Street and Lawrence Drive properties in petitioner's hands. McDonald Street, which petitioner purchased in 1976-77, had an adjusted basis in his hands substantially lower than his cost of Lawrence Drive, which he purchased in 1992. Petitioner therefore reported as the taxable sale not his permanent relinquishment to WLC of the low-basis McDonald Street property, but rather the first leg of the "repo" transaction that temporarily parked the high-basis Lawrence Drive property with WLC.

Legal and Administrative Background

The primary reason that has been given for deferring recognition of gain under section 1031(a) on exchanges of like-kind property is that the exchange does not materially alter the taxpayer's economic position; the property received in the exchange is considered a continuation of the old property still unliquidated. See, e.g., Koch v. Commissioner, 71 T.C. 54, 63-64 (1978). However, section 1031(a) does not go so far in implementing this notion as to be a reinvestment rollover provision, like section 1033 or section 1034. A sale of qualified property for cash requires that gain or loss be

recognized under the general rule of section 1001(c); such a sale does not become part of a qualifying exchange under section 1031(a) even though the cash received on the sale is immediately invested in like property.  Compare Coastal Terminals, Inc. v. United States, 320 F. 2d 333, 337 (4th Cir. 1963), with Rogers v. Commissioner, 44 T.C. 126, 136 (1965), affd. per curiam 377 F.2d 534 (9th Cir. 1967).

Petitioners remind us, and we are well aware--as we stated in another section 1031 exchange case in which we held against the taxpayer--that "Notwithstanding the familiar and long-standing rule that exemptions are to be narrowly or strictly construed, * * * section 1031 has been given a liberal interpretation." Estate of Bowers v. Commissioner, 94 T.C. 582, 590 (1990) (citing Biggs v. Commissioner, 69 T.C. 905, 913-914 (1978), affd. 632 F.2d 1171 (5th Cir. 1980)).  The courts have exhibited a lenient attitude toward taxpayers in like-kind exchange cases, particularly toward deferred exchanges.  See, e.g., Starker v. United States, 602 F.2d 1341 (9th Cir. 1979). The Commissioner has also played a facilitating role by issuing regulations that provide safe harbors for deferred exchanges, see sec. 1.1031(k)-1, Income Tax Regs., under the statutory limitations imposed on such exchanges by section 1031(a)(3), as enacted by Deficit Reduction Act of 1984, Pub. L. 98-369, sec.

77(b), 98 Stat. 596. These regulations, with their provisions for use of third-party "qualified intermediaries" as accommodation titleholders, who will not be considered the taxpayer's agent in doing the multiparty deferred exchanges permitted by the regulations, have encouraged the growth of a new industry of third-party exchange facilitators.

The subject transactions present a case of first impression in this Court. They reflect the effort of petitioner and his advisers to implement a so-called reverse exchange directly with WLC, without the participation of a third-party exchange facilitator. Reverse exchanges have been described as transactions in which the taxpayer locates and identifies the replacement property (and acquires it or causes it to be acquired on his behalf by an exchange facilitator) before he is ready to transfer the property to be relinquished in exchange. The preamble to the deferred exchange regulations, sec. 1.1031(k)-1, Income Tax Regs., made clear the Commissioner's view that section 1031(a)(3) and the deferred-exchange regulations do not apply to reverse exchanges. See T.D. 8346, 1991-1 C.B. 150, 151.

The Commissioner has recently responded to industry and practitioner requests for guidance[5] by publishing a revenue

---

[5] See, e.g., American Bar Association Section on Taxation, Committee on Sales, Exchanges and Basis, Report on the
(continued...)

procedure describing the Commissioner's conditions for qualifying reverse exchanges for nonrecognition of gain under section 1031(a)(1). See Rev. Proc. 2000-37, 2000-40 I.R.B. 308. Like the deferred exchange regulations that implement section 1031(a)(3), the revenue procedure provides for third-party qualified intermediaries as exchange accommodation titleholders in carrying out the "qualified exchange accommodation arrangements" whose use will qualify reverse exchanges for nonrecognition of gain or loss under section 1031(a)(1). Like the deferred exchange regulations, the revenue procedure provides a safe harbor; it states that "the Service recognizes that 'parking' transactions can be accomplished outside of the safe harbor provided this revenue procedure", but that "no inference is intended with respect to the federal income tax treatment of 'parking' transactions that do not satisfy the terms of the safe harbor". Rev. Proc. 2000-37, 2000-40 I.R.B. 308.

Because the revenue procedure is prospectively effective, it does not apply to the case at hand. See id. We therefore have

---

[5](...continued)
Application of Section 1031 to Reverse Exchanges, 21 J. Real Est. Tax. 44 (1993); Handler, Pricewaterhouse Coopers Forwards Proposed Guidance on Reverse Exchanges, 2000 TNT 16-27, Doc. 2000-2588 (Jan. 25, 2000); Safe Harbor Guidance for Reverse Like-kind Exchanges To Come Soon, IRS Official Promises, Highlights and Documents 1157 (Jan. 25, 2000).

recourse to general principles of tax law to answer the question posed by repondent's determination.

Analysis and Conclusion

In the case at hand, petitioner did not just locate and identify the Lawrence Drive property in anticipation of acquiring it as replacement property in exchange for the McDonald Street property that he intended to relinquish. He purchased the Lawrence Drive property without the participation of an exchange facilitator a year or more before he was ready to relinquish the McDonald Street property and relocate his business to the Lawrence Drive property. In the following year, petitioner transferred title to the Lawrence Drive property, subject to a reacquisition agreement--the Exchange Agreement--not to a third-party exchange facilitator, but to WLC, the party to which he simultaneously obligated himself to relinquish the McDonald Street property.

In forgoing the use of a third party and doing all the transfers with WLC, petitioner and his advisers created an inherently ambiguous situation. The ambiguity is exacerbated by the fact that petitioner and WLC agreed in the Exchange Agreement that the McDonald Street property and the unimproved Lawrence Drive property were of equal value, $142,400. So when WLC paid petitioner $142,400--at the same time that he permanently

relinquished the McDonald Street property to WLC--was the payment received by petitioner from WLC the sale price of the McDonald Street property at the December 29 closing, as respondent determined? Or was it the deferred purchase price on petitioner's September 24 quitclaim transfer of title to the unimproved Lawrence Drive property (which petitioner received back on December 29 from WLC with the substantially completed building that had been erected on it in the intervening 3 months), as petitioner reported?

Our approach to answering these questions is to determine for tax purposes whether WLC became the owner of the Lawrence Drive property during the 3-month period it held title to the property while the building was being built on it to petitioner's specifications. If petitioner remained the owner of the Lawrence Drive property during this period, petitioner could not engage in a qualified like-kind exchange of the McDonald Street property for the Lawrence Drive property, and the $142,400 payment received by petitioner would be deemed the sale price of the McDonald Street property. A taxpayer cannot engage in an exchange with himself; an exchange ordinarily requires a "reciprocal transfer of property, as distinguished from a transfer of property for a money consideration". Sec. 1.1002-1(d), Income Tax Regs.

WLC did not acquire any of the benefits and burdens of ownership of the Lawrence Drive property during the 3-month period it held title to that property. WLC acquired no equity interest in the Lawrence Drive property. WLC made no economic outlay to acquire the property. WLC was not at risk to any extent with respect to the Lawrence Drive property because the obligation and security interest it gave back on its purported acquisition of the property were nonrecourse. WLC merely obligated itself to reconvey to petitioner prior to yearend the Lawrence Drive property with a substantially completed building on it that had been built to his specifications and that pursuant to prearrangement he was obligated to take and pay for.

The parties treated WLC's holding of title to the Lawrence Drive property as having no economic significance. The transaction was not even used as a financing device. No interest accrued or was paid on the nonrecourse note and mortgage, which assured that petitioner would get back the Lawrence Drive property after it had been improved. WLC had no exposure to real estate taxes that accrued with respect to the property while WLC held the title; all such taxes were to be paid by petitioner. No account was to be taken under the terms of the reacquisition agreement of any value that had been added to the property by reason of the building constructed in the interim. The

construction was financed by petitioner through the bank he was accustomed to dealing with.  Petitioner through his guaranty and reacquisition obligation was at all times at risk with respect to the Lawrence Drive property.  WLC had no risk or exposure with respect to the additional outlay of funds required to finance construction of the building.  WLC had no potential for or exposure to any economic gain or loss on its acquisition and disposition of title to the Lawrence Drive property.

The reality of the subject transactions as we see them is a taxable sale of the McDonald Street property to WLC. Petitioner's purchase in 1992 of the Lawrence Drive property, on which he intended to build a new facility for his business as the replacement for his McDonald Street property, put him in the position of arranging to improve the Lawrence Drive property, as well as to sell the McDonald Street property.  Petitioner's prior quitclaim transfer to WLC of title to the unimproved Lawrence Drive property, which petitioners try to persuade us was petitioner's taxable sale, amounted to nothing more than a parking transaction by petitioner with WLC, which contractually bound itself to acquire from petitioner the McDonald Street property that petitioner was going to relinquish permanently, as well as to reconvey to petitioner the Lawrence Drive property as

soon as the facility to be built thereon to his specifications was substantially completed.

The reconveyance to petitioner of the Lawrence Drive property was not part of an exchange by petitioner of the McDonald Street property. That reconveyance of the Lawrence Drive property to petitioner merely reunited in his hands the bare legal title to the Lawrence Drive property with the beneficial ownership therein that he had continued to hold all along while the building that he obligated himself to pay for was being built to his specifications.

In support of their claim that petitioner exchanged the McDonald Street property for the improved Lawrence Drive property, petitioners point out that the improved Lawrence Drive property was different from the unimproved Lawrence Drive property that he acquired in 1992 and whose title he transferred to WLC on September 24, 1993. Petitioners state: "Petitioners sold unimproved land (and reported the transaction) and in the exchange got back improved real estate they could continue their business operation in." It's true that unimproved property and improved property are different from each other; they are not "similar or related in service or use" for the purpose of the section 1033 rollover provision. See sec. 1.1033(a)-2(c)(9), Income Tax Regs. However, the transformation of the Lawrence

Drive property while title was parked with WLC does not gainsay our conclusion.  In substance, petitioner never disposed of the Lawrence Drive property and remained its owner during the 3-month construction period because the transfer of title to WLC never divested petitioner of beneficial ownership.

Having set forth our analysis and conclusion, we now address the authorities cited by petitioners[6] as favoring their position or as being distinguishable.

Authority in the Court of Appeals for the Seventh Circuit

The only case in the Seventh Circuit--the circuit to which any appeal would lie in the case at hand--that the parties have

---

[6] Petitioners contend that their advisers relied on two private letter rulings in structuring the subject transactions: Priv. Ltr. Rul. 78-23-035 (Mar. 9, 1978), which they characterize as "nearly identical to the facts in our case", and Priv. Ltr. Rul. 91-49-018 (Sept. 4, 1991), which they cite as "virtually directly on point (even goes farther than our case) on how a transaction can be structured".  Petitioners' contentions are unavailing; not only does sec. 6110(j)(3) provide that private letter rulings cannot be cited as precedent, but, unlike the case at hand, the other  party to the transaction in both private letter rulings had the risks of ownership during the relevant time period.  Similarly, Rev. Rul. 75-291, 1975-2 C.B. 333, and Rev. Rul. 77-297, 1977-2 C.B. 304, cited in Priv. Ltr. Rul. 78-23-035, don't help petitioners; not only does this Court regard published rulings as having no precedential value, see Estate of Lang v. Commissioner, 613 F.2d 770, 776 (9th Cir. 1980), affg. on this issue 64 T.C. 404, 406-407 (1975); Intel Corp. & Consol. Subs. v. Commissioner, 102 T.C. 616, 621 (1993); Stark v. Commissioner,86 T.C. 243, 250-251 (1986), but the facts of both rulings, like Priv. Ltr. Rul. 91-94-018 (Sept. 4, 1991), are distinguishable from the case at hand in the same dispositive respect.

brought to our attention is <u>Bloomington Coca-Cola Bottling Co. v. Commissioner</u>, 189 F.2d 14 (7th Cir. 1951), affg. a Memorandum Opinion of this Court dated Aug. 10, 1950. Petitioners try to distinguish the <u>Bloomington Coca-Cola Bottling Co.</u> case, but we find it highly instructive.

The taxpayer had originally reported the transaction in issue as a sale at a loss in the year it occurred, 1939, but contended--for 1943 and 1944 excess profits tax purposes--that the transaction had been an exchange under the statutory predecessor of section 1031(a) in which no loss had been recognized. The taxpayer's change in position was attributable to its desire not to reduce its excess profits tax base.

The taxpayer had outgrown its old bottling plant and hired a contractor to erect a new plant, on the taxpayer's land, at an agreed cost of $72,500. Included in the consideration paid by the taxpayer to the contractor was the old bottling plant and the parcel of land on which it was located, at an agreed value of $8,000, plus cash of $64,500. The taxpayer reported on its 1939 income tax return a loss of approximately $23,000 on the sale of the old plant.

As this Court pointed out in its Memorandum Opinion: "Here the contractor was not the owner of the land upon which the new building was constructed, never owned the new building, and never conveyed the new building to the petitioner".

The Tax Court held--and the Court of Appeals affirmed--that the transaction was in effect the purchase of a new facility, and not an exchange of unimproved property for improved property, inasmuch as the taxpayer already owned the land on which the new plant was constructed. The contractor could not be a party to an exchange with the taxpayer because the contractor was never the owner of the property that the taxpayer received in the so-called exchange. The contractor was merely acting as a service provider in the construction of the new plant. The only real property to which the contractor acquired title was the land and old plant that it received as part payment for the construction services it provided.

The subject transactions are similar to those in Bloomington Coca-Cola Bottling Co. v. Commissioner, supra, in significant respects. The taxpayer sold its old bottling plant (petitioner sold the McDonald Street property) to the only other party it was dealing with, the contractor (WLC). The taxpayer hired a contractor to build a new facility on land that it owned. In the case at hand, petitioner's conveyance of title to the unimproved Lawrence Drive property and the conveyance of that property back with a substantially completed building on it are to be disregarded; WLC never acquired any of the benefits and burdens of ownership of the Lawrence Drive property. WLC acquired no equity or beneficial interest in the Lawrence Drive property, no

risk of loss or opportunity for gain, no exposure to real estate taxes or other carrying charges, no liability even for interest on its nonrecourse secured obligation during the interim period. All we are left with, as in Bloomington Coca-Cola Bottling Co., is that a building was built for petitioner according to his specifications on land that he owned and petitioner was obligated to pay for that building. The taxpayer in Bloomington Coca-Cola Bottling Co. and petitioner also sold their old property to the party with whom they dealt in connection with the building of the new facility.[7]

Authorities Relied on by Petitioners

We now turn to the cases petitioners rely on to support their contention that petitioner exchanged the McDonald Street property for the substantially improved Lawrence Drive property: J.H. Baird Publg. Co. v. Commissioner, 39 T.C. 608 (1962); Coupe

_____

[7] We have found no other like-kind exchange cases in the Seventh Circuit that bear on the issue in the case at hand. However, another Seventh Circuit case worth noting is Patton v. Jonas, 249 F.2d 375 (7th Cir. 1957), which applies the same analysis as the line of Sixth Circuit cases culminating in First Am. Natl. Bank of Nashville v. United States, 467 F.2d 1098 (6th Cir. 1972), which hold that "repo" transactions in tax-exempt bonds are to be treated as secured loans so that the purchaser in form is treated as a lender not entitled to exclude the tax-exempt bond interest from its income; this is because the original seller remains the owner of the bonds for tax purposes. See also Green v. Commissioner, 367 F.2d 823, 825 (7th Cir. 1966), affg. T.C. Memo. 1965-272; Commercial Capital Corp. v. Commissioner, T.C. Memo. 1968-186. Compare Rev. Rul. 74-27, 1974-1 C.B. 24 (repurchase obligation) with Rev. Rul. 82-144, 1982-2 C.B. 34 (separately purchased and paid-for put).

v. Commissioner, 52 T.C. 394, 409-410 (1969); 124 Front Street, Inc. v. Commissioner, 65 T.C. 6 (1975); Biggs v. Commissioner, 69 T.C. 905 (1978), affd. 632 F.2d 1171 (5th Cir. 1980); Fredericks v. Commissioner, T.C. Memo. 1994-27.

We preface our review of these cases by acknowledging that they all reflect, to some degree, the liberal interpretation in favor of taxpayers that this Court and other courts have applied in cases under section 1031(a)(1). We also observe that none of these cases concerned a reverse exchange and that all of them are highly fact specific and therefore distinguishable from the case at hand. Petitioners have read these cases selectively, emphasizing in each of them what the taxpayer got away with. In so doing, petitioners have lost sight of the cumulative adverse effect on their position of all the facts in the case at hand, which have led to our conclusion that WLC never acquired beneficial ownership of the Lawrence Drive property. It would therefore be a sterile exercise to engage in a detailed recitation of the facts of these cases and a point-by-point refutation of their applicability to the case at hand. A couple of highlights from J.H. Baird Publg. Co. v. Commissioner, supra, will suffice.

Petitioners try to make something of the fact that the Court in J.H. Baird Publg. Co. v. Commissioner, 39 T.C. at 618, distinguished Bloomington Coca-Coca Bottling Co. v. Commissioner,

189 F.2d 14 (7th Cir. 1951), on the ground that "It was clear that the contractor did not own the other property which, it was claimed, was transferred to the taxpayer in the exchange."  As already indicated, we have found dispositive in the case at hand that WLC never acquired beneficial ownership of the Lawrence Drive property.[8]  WLC merely served as an accommodation party, providing the parking place for legal title to the Lawrence Drive property, while petitioner remained the beneficial owner before and after and throughout the 3-month focal period of the subject transactions.

When petitioner conveyed to WLC title to the Lawrence Drive property, WLC became contractually bound to reconvey it, and petitioner was bound to take it back, prior to yearend (not much more than 3 months).  Indeed, under Wisconsin law, both parties were entitled to specific performance of the other party's obligation.  See Anderson v. Onsager, 455 N.W.2d 885 (Wis. 1990); Heins v. Thompson & Flieth L. Co., 163 N.W. 173 (Wis. 1917).  It's difficult to imagine commitments more binding than the reciprocal obligations of petitioner and WLC in the case at hand.  The conveyance and reconveyance of title to the Lawrence Drive

---

[8] We also observe that J.H. Baird Publg. Co. v. Commissioner, 39 T.C. 608, 618 (1962), on which petitioners rely, applied the concept of beneficial ownership in the taxpayer's favor.  Petitioners have failed to persuade us that the concept of beneficial ownership is an illegitimate importation into the tax law of qualified like-kind exchanges.

property must be disregarded as having no tax significance because, at the end of the day, petitioner ended up where he started, with title to and beneficial ownership of the Lawrence Drive property.[9]

## Computational Questions

Petitioners point out that respondent's deficiency notice, which made an upward adjustment of $82,569 in long-term gain realized and recognized by petitioners on the disposition of the McDonald Street property, which we have found to be the actual sale, failed to back out the short-term gain of $5,373 that petitioners reported on the transfer of title to the unimproved Lawrence Drive property. Petitioners' point is well taken. It should be addressed in the Rule 155 computation.

Similarly, other matters not completely resolved, such as the calculation of additional costs paid by petitioner in connection with the sale of the McDonald Street property, as well as his adjusted basis in that property, should be addressed in the Rule 155 computation of the gain on the sale.

## Penalty Question

The subject transactions were structured by petitioner's accountant and attorneys after petitioner presented them with the

---

[9] In so doing, the subject transactions satisfy the requirements for application of what the Court of Appeals for the Seventh Circuit has characterized as the most restrictive and rigorous version of the step-transaction doctrine: the binding commitment test. McDonald's Restaurants, Inc. v. Commissioner, 688 F.2d 520, 525 (7th Cir. 1982), revg. 76 T.C. 872 (1981).

accomplished fact of his purchase of the Lawrence Drive property. Petitioners' 1993 income tax return, prepared by petitioner's accountant, reported a taxable short-term gain of $5,373 on the sale of "investment land" and reported a like-kind exchange of "land and building" for "land and building" on Form 8824. The disclosures were bare bones but adequate to trigger the audit that led to the deficiency notice and the case at hand.

Respondent determined that petitioners were liable for an accuracy-related penalty under section 6662(a) and (b)(1) or (2). Section 6662(a) imposes a 20-percent accuracy-related penalty on the portion of an underpayment that is due to one or more causes enumerated in section 6662(b). Respondent relies on subsections (b)(1) (negligence or intentional disregard of rules or regulations) or (b)(2) (substantial understatement of income tax).

Petitioners argue they are not liable for the penalty. Petitioners point out that a certified public accountant outlined the subject transactions as they were carried out and prepared their return and that the deal was structured and the papers drawn by petitioners' attorneys. Petitioners contend that they reasonably relied on professional advice in the preparation of their return and that they are entitled to relief under the exceptions that apply to a substantial understatement.

Negligence includes a failure to attempt reasonably to comply with the Code. See sec. 6662(c). Disregard includes a

careless, reckless, or intentional disregard.  See id.
Negligence is the failure to exercise due care or the failure to
act as a reasonable and prudent person.  See Neely v.
Commissioner, 85 T.C. 934, 947 (1985).

No penalty is imposed for negligence or intentional
disregard of rules or regulations or a substantial understatement
of income if the taxpayer shows that the underpayment is due to
reasonable cause and the taxpayer's good faith.  See sec.
6664(c); secs. 1.6662-3(a), l.6664-4(a), Income tax Regs.

Reasonable cause requires that the taxpayer have exercised
ordinary business care and prudence as to the disputed item.  See
United States v. Boyle, 469 U.S. 241 (1985); see also Estate of
Young v. Commissioner, 110 T.C. 297, 317 (1998).  The good faith,
reasonable reliance on the advice of an independent, competent
professional as to the tax treatment of an item may meet this
requirement.  See United States v. Boyle, supra; sec. 1.6664-
4(b), Income Tax Regs.; see also Richardson v. Commissioner, 125
F.3d 551 (7th Cir. 1997), affg. T.C. Memo. 1995-554; Ewing v.
Commissioner, 91 T.C. 396, 423 (1988), affd. without published
opinion 940 F.2d 1534 (9th Cir. 1991).

Whether a taxpayer relies on advice and whether such
reliance is reasonable depend on the facts and circumstances of
the case and the law that applies to those facts and
circumstances.  See sec. 1.6664-4(c)(i), Income Tax Regs.  A
professional may render advice that may be relied upon reasonably

when he or she arrives at that advice independently, taking into account, among other things, the taxpayer's purposes for entering into the underlying transaction.  See sec. 1.6664-4(c)(i), Income Tax Regs.; see also Leonhart v. Commissioner, 414 F.2d 749 (4th Cir. 1969), affg. T.C. Memo. 1968-98.  Reliance is unreasonable when the taxpayer knew, or should have known, that the adviser lacked the requisite expertise to opine on the tax treatment of the disputed item.  See sec. 1.6664-4(c), Income Tax Regs.

In sum, for a taxpayer to rely reasonably upon advice so as possibly to negate a section 6662(a) accuracy-related penalty determined by the Commissioner, the taxpayer must prove that the taxpayer meets each requirement of the following three-prong test:  (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment.  See Ellwest Stereo Theatres, Inc. v. Commissioner, T.C. Memo. 1995-610; see also Rule 142(a).

We conclude on the record before us that petitioners actually relied in good faith on disinterested professional advisers who structured the transactions and prepared their return.  Petitioners were justified in their reliance, notwithstanding that we have upheld respondent's determination

that the subject transactions did not qualify as a like-kind exchange of the Lawrence Drive property.  Accordingly, we hold for petitioners on the penalty issue.

 To give effect to the foregoing,

 Decision will be entered under Rule 155.