T.C. Memo. 2011-42

UNITED STATES TAX COURT

ROGER S. AND LISA G. CAMPBELL, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 22750-05.          Filed February 17, 2011.

Roger S. and Lisa G. Campbell, pro se.

<u>Robert V. Boeshaar</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, <u>Judge</u>:  Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1998, 1999, and 2001 of $13,530, $7,013, and $751, respectively, as

well as a $3,383 addition to tax under section 6651(a)(1)[1] for 1998.

After concessions,[2] the issues for decision are: (1) Whether petitioners' activity as Amway distributors was an activity not engaged in for profit within the meaning of section 183 for taxable years 1998, 1999, 2000,[3] and 2001; (2) whether petitioners have substantiated claimed expenses from the Amway activity for 1999 to the extent of gross profit from the activity; (3) whether petitioners are entitled to deductions for rental property expenses for 1998 and 1999; (4) whether petitioners sustained a net operating loss in 2000 that may be carried to one or more of the years in issue under section 172; and (5) whether petitioners are liable for an addition to tax for failure to timely file their 1998 Federal income tax return.

---

[1]All section references are to the Internal Revenue Code of 1986, as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Petitioners concede that they are not entitled to deduct $4,535 of expenses claimed with respect to their construction business for 1998. Respondent concedes that petitioners are entitled to a deduction for a wages expense of $2,699 for 1998. Certain other adjustments are computational in nature.

[3]Although respondent did not determine a deficiency for 2000, a determination under sec. 183 is necessary for 2000 in order to determine the amount of any net operating loss petitioners may carry back from that year.

## FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found.  Petitioners resided in Washington when they filed the petition.

During the years in issue petitioners operated two businesses in addition to the Amway activity.  Petitioner Lisa G. Campbell (Mrs. Campbell) operated Preview Properties, a real estate sales business.  Mrs. Campbell spent significant time, including weekends, conducting the real estate business.  For 1998 and 1999 petitioners reported profits of $144,263 and $43,189, respectively, from Preview Properties; they reported losses from the business for 2000 and 2001 of $4,892 and $5,237, respectively.

Also during the years in issue petitioner Roger S. Campbell (Mr. Campbell) operated RC Construction, a general construction business, which he had operated since 1988.  Mr. Campbell spent significant time during the years in issue managing his construction business.  For 1998 and 2000 petitioners reported losses of $11,188 and $4,224, respectively, from RC Construction, while for 1999 and 2001 they reported profits of $20,000 and $8,933, respectively.

Amway Activity

Beginning in 1995 and during the years in issue petitioners operated an Amway[4] distributorship under the name RLC Enterprises. Amway is a supplier of household, cosmetic, and nutritional products that are sold by individual distributors through direct marketing. Petitioners had not been involved with a direct marketing activity before becoming involved with Amway. They began their distributorship after being recruited by another Amway distributor in 1995.

An Amway distributor could generate revenue by selling Amway merchandise directly to consumers at a retail markup or through "performance bonuses" tied to the volume of products sold to other Amway distributors he had recruited. The individuals recruited by an Amway distributor were referred to as the recruiting distributor's "downline" distributors; the recruiting distributor was referred to as the "upline" or "sponsor" distributor of the downline distributor. A downline distributor obtained his merchandise from his sponsor distributor, and the sponsor distributor received performance bonuses from Amway based on the volume of merchandise he sold to his downline distributors. These performance bonuses created an incentive for

_____

[4]The servicing corporation for petitioners' distributorship was Amway in 1998 and Quixtar, Inc., thereafter. For convenience, we refer to petitioners' distributorship as their Amway activity and to the servicing corporation as Amway throughout this opinion.

a sponsor distributor's downline distributors to themselves become sponsor distributors of additional downline distributors in order to earn performance bonuses on the sales of distributors who were downline to them--thus creating a pyramid of distributors below a sponsor distributor that boosted the sponsor distributor's volume for purposes of performance bonuses. Performance bonuses were computed as a percentage of sales volume without regard to profitability. The percentage increased as sales volume exceeded certain thresholds. Thus, Amway distributors could maximize revenue by recruiting a large group of downline distributors whom they in turn encouraged to sell or distribute Amway merchandise and to make new recruits.

Any Amway merchandise that an Amway distributor purchased for personal use was also counted as a sale for purposes of computing volume for performance bonuses. Such merchandise could be purchased by an Amway distributor at a discount below retail price.

Finally, certain Amway distributors were eligible to purchase, for their own use or for sale to their downline distributors, various "business support" materials including books, magazines, other printed materials, audiotapes, videotapes, software, and other electronic media to assist distributors with training and motivation of themselves or

recruits.[5]   Petitioners purchased various business support materials during the years in issue for their own use and for resale to their downline distributors.

Amway promoted the performance-bonus-generated pyramid structure of its distributors through its independent business ownership plan.  Petitioners focused on implementing the independent business ownership plan and did not attempt to set up a business plan of their own.

Petitioners did not obtain any independent advice before beginning to operate their Amway distributorship, with the exception of that of their stockbroker, who counseled against it. Petitioners instead relied on the advice of other Amway distributors, particularly their upline distributors.

Petitioners participated in Amway training functions organized by Worldwide Group, L.L.C. (Worldwide Group). Worldwide Group was operated by several Amway distributors specifically to coordinate training and motivational seminars for other Amway distributors.  Petitioners participated in perhaps three out-of-town seminars organized by Worldwide Group each year, as well as local sessions monthly.  The out-of-town functions would generally take place over a weekend and would

---

[5]According to Amway promotional materials, the purveyors of these business support materials were independent of Amway or its affiliates.

typically include lectures and workshops as well as social functions.

Petitioners concentrated on recruiting downline distributors and marketing Amway merchandise to them, expending significant time and effort for those purposes. In this connection, petitioners would make presentations at which they provided free samples of some of the Amway products and/or business support materials. The distribution of the Amway products petitioners sold to their downline distributors was time consuming, consisting of taking and submitting distributors' weekly orders, collecting and remitting payments to petitioners' upline distributor, and distributing the merchandise to their downline distributors. Each week Mrs. Campbell would also ship or deliver any products she had sold directly to retail customers.

Petitioners also purchased Amway products for personal use; as distributors, their purchases were often at a discount. Mr. Campbell purchased a truck at a discount through a program affiliated with Amway, and petitioners also purchased appliances, electronics, clothing, office supplies, and nutritional products through Amway. Petitioners also purchased Amway products for use in their other businesses. Amway was a substantial source of materials and supplies for Mr. Campbell's construction business. Petitioners' records show that in 1999 $14,418 worth of their Amway purchases was used in Mr. Campbell's construction business.

Mrs. Campbell used Amway products to furnish model houses in her real estate business and for gift baskets for clients. While some of the products petitioners purchased for personal use or use in their other businesses were not eligible for discounts, the purchases nonetheless augmented petitioners' sales volume so as to increase their performance bonuses.

Mrs. Campbell kept voluminous notes on petitioners' Amway activity, but petitioners made no written projections for profit, loss, or break-even scenarios with regard to the Amway activity. Petitioners would learn the extent of their profit or loss from the Amway activity for any given year when they prepared the year's tax return. Their returns for 1998 and 2000 were filed approximately 22 months after the close of the respective years; their 1999 and 2001 returns were filed approximately 10 months after the close of the respective years. Thus, petitioners were generally not aware of the profitability of their Amway activity for any given period until much later.

Petitioners experienced losses from their Amway activity in every year from its inception through the years in issue. For the years in issue and 2000, petitioners reported the following gross receipts and claimed the following costs of goods sold, expenses, and losses attributable to their Amway activity on their Schedules C, Profit or Loss From Business:

| Year | Gross Receipts | Cost of Goods Sold | Gross Profit | Expenses | Net Profit |
|---|---|---|---|---|---|
| 1998 | $19,984 | $44,745 | ($24,761) | $13,761 | ($38,522) |
| 1999 | 52,620 | [1]57,145 | (4,525) | 19,960 | (24,485) |
| 2000 | 74,690 | 83,372 | (8,682) | 16,795 | (25,477) |
| 2001 | 103,266 | 108,272 | (5,006) | 14,974 | (19,980) |

[1]Petitioners now contend this figure is $54,999.

Respondent contends that petitioners had the following amounts of gross receipts, costs of goods sold, expenses, and losses attributable to their Amway activity:

| Year | Gross Receipts | Cost of Goods Sold | Gross Profit | Expenses | Net Profit |
|---|---|---|---|---|---|
| 1998 | $19,984 | $21,345 | ($1,361) | $11,095 | ($12,456) |
| 1999 | 52,620 | 38,311 | 14,309 | 9,941 | 4,368 |
| 2000 | 74,690 | N/A | N/A | 18,528 | N/A |
| 2001 | 103,266 | 108,272 | (5,006) | [1]14,243 | (19,249) |

[1]The notice of deficiency determined that petitioners had substantiated $18,139 of expenses for 2001.  Of this $5,884 was attributable to a claimed expense for commissions and fees which the parties now agree was already included in petitioners' cost of goods sold.

To summarize, respondent has allowed amounts for costs of goods sold for both 1998 and 2001 that exceed petitioners' gross receipts from the Amway activity.  Respondent also concedes that petitioners have substantiated operating expenses that further increase the losses generated by the Amway activity.  However, with respect to 1999, respondent's disallowance of approximately one-third of petitioners' claimed cost of goods sold and one-half of petitioners' claimed operating expenses results in gross and

net profits of $14,309 and $4,368, respectively, from the Amway activity for that year.

At the time of trial petitioners continued to be involved in the Amway activity and they had no intention of discontinuing it.

Rental Property Expenses

During the years at issue petitioners owned an unfinished house in Montana, which was on land they leased from Mrs. Campbell's parents for $100 per year.  In 1997 Mrs. Campbell and her parents executed a document labeled a "purchase agreement" which provided that Mrs. Campbell would purchase a horse from her parents for $9,500.  The document further provided that in lieu of any cash payment for the horse, the unfinished house would be rented to Mrs. Campbell's parents for $500 annually, $300 of which was to be credited against the purchase price of the horse and $200 of which was for Mrs. Campbell's parents' care of the horse.

With respect to the house, petitioners reported $500 in rental income for both 1998 and 1999 on Schedules E, Supplemental Income and Loss, and claimed thereon $4,299 and $4,481, respectively, for rental property expenses.

Notice of Deficiency

After conducting an examination of petitioners' 1998-2001 returns, respondent issued them a notice of deficiency.  The notice determined that petitioners did not engage in their Amway

activity with a profit objective for 1998-2001 and made adjustments for all 4 years, including 2000, but it did not determine a deficiency for 2000 because the adjustments for that year resulted in a loss.

The adjustments for 2000 included disallowance of the $25,477 loss petitioners claimed with respect to their Amway activity. However, respondent made no adjustment to the $4,892 loss petitioners claimed with respect to Mrs. Campbell's real estate business. With respect to the $4,224 loss petitioners claimed from Mr. Campbell's construction business, the notice allowed an additional $3,614 depreciation expense, increasing the loss by that amount. The aggregate result of the adjustments to petitioners' 2000 return was to reduce their claimed loss for the year from $60,464 to $38,601.

OPINION

I. Burden of Proof

The Commissioner's determinations in the notice of deficiency are presumed correct, and the taxpayer generally bears the burden of proving that the determinations are in error. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). However, under section 7491(a), the burden of proof on any factual issue relevant to a taxpayer's liability for tax shifts to the Commissioner if the taxpayer has introduced credible evidence with respect to that issue and has satisfied certain

other conditions, including compliance with the Internal Revenue Code's substantiation requirements. Sec. 7491(a)(1) and (2). As discussed infra, petitioners have failed to provide substantiation for required items. Accordingly, they are not entitled to a shift in the burden of proof under 7491(a).

II. Applicability of Section 183 to Petitioners' Amway Activity

A. In General

Under section 183(a), if an activity is not engaged in for profit, then no deduction attributable to that activity is allowed except to the extent provided by section 183(b). In pertinent part, section 183(b) allows those deductions that would have been allowable had the activity been engaged in for profit only to the extent of gross income derived from the activity (reduced by deductions attributable to the activity that are allowable without regard to whether the activity was engaged in for profit).

Section 183(c) defines an activity not engaged in for profit as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Deductions are allowable under section 162 or under section 212(1) or (2) if the taxpayer is engaged in the activity with the "actual and honest objective of making a profit". Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir.

1983); <u>Golanty v. Commissioner</u>, 72 T.C. 411, 426-427 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). The taxpayer need not, however, establish that his or her expectation of profit was reasonable. See <u>Dreicer v. Commissioner</u>, <u>supra</u> at 644-645; sec. 1.183-2(a), Income Tax Regs.

The existence of the requisite profit objective is a question of fact that must be decided on the basis of the entire record. <u>Elliott v. Commissioner</u>, 84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); <u>Dreicer v. Commissioner</u>, <u>supra</u> at 645; sec. 1.183-2(b), Income Tax Regs. In resolving this factual question, greater weight is given to objective facts than to a taxpayer's statement of intent. See <u>Westbrook v. Commissioner</u>, 68 F.3d 868, 875-876 (5th Cir. 1995), affg. T.C. Memo. 1993-634; sec. 1.183-2(a), Income Tax Regs.

The regulations set forth a nonexhaustive list of factors that may be considered in deciding whether a profit objective exists. These factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if

any, which are earned; (8) the financial status of the taxpayer; and (9) any elements indicating personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs.

No single factor, nor even the existence of a majority of factors supporting or rebutting the existence of a profit objective, is controlling. Id. Rather, all facts and circumstances with respect to the activity are to be taken into account. Id.

The parties agree that the appreciation of assets has no meaningful application as a factor with respect to determining petitioners' profit motivation in pursuing their Amway activity. The parties disagree whether the other regulatory factors are indicative of a profit objective.

B. Manner in Which Petitioners Carried On the Amway Activity

If a taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records, it may indicate a profit objective. Sec. 1.183-2(b)(1), Income Tax Regs. However, if there is a lack of evidence that the taxpayer's records were used to improve the performance of a losing operation, such records generally do not indicate a profit objective. Golanty v. Commissioner, supra at 430; see also Sullivan v. Commissioner, T.C. Memo. 1998-367, affd. without published opinion 202 F.3d 264 (5th Cir. 1999). In particular, keeping records that are used only for purposes of preparing tax

returns is not indicative of a profit objective.  See Rowden v. Commissioner, T.C. Memo. 2009-41; Kinney v. Commissioner, T.C. Memo. 2008-287.

Petitioners did not conduct the Amway activity in a businesslike manner.  Although they maintained a separate bank account for the activity and maintained records for certain aspects of it, petitioners never used these records as an analytical tool for improving profitability.  Mrs. Campbell testified that she did not know whether the Amway activity was profitable in any given year until she completed petitioners' tax return for that year which, for 2 of the taxable years in issue, did not occur until almost 2 years later.  It is a fair inference that petitioners' recordkeeping was directed more towards substantiating deductions on a tax return than assessing the profitability of the Amway activity.

Moreover, petitioners' Amway records were incomplete and unreliable.  Petitioners' recordkeeping made it impossible to distinguish between Amway product purchases that were properly includible in costs of goods sold and those that were withdrawn from the business for personal consumption, leading respondent to disallow a substantial portion of petitioners' claimed costs of goods sold.  At the examination the revenue agent determined that she needed to reconstruct petitioners' costs of goods sold for 1998 and 1999 to ascertain the extent to which the Amway products

purchased by petitioners and included by them in costs of goods sold had in fact not been resold to downline distributors.  The revenue agent compared petitioners' total Amway product purchases with the deposits into their Amway account of checks written to them by individuals, treating all such checks as payments for Amway products from downline distributors.  The revenue agent treated the difference between the total Amway products purchased and the amounts received from downline distributors as representing the value of Amway products that had been withdrawn from inventory by petitioners for personal use.  The computation made by the revenue agent was as follows:

|                                    | 1998      | 1999      |
|------------------------------------|-----------|-----------|
| Purchases                          | $58,402   | $72,384   |
| Less payments from distributors    | (19,665)  | (38,311)  |
|                                    | 38,737    | 34,073    |
| Less inventory at end of year      | (2,732)   | (4,220)   |
| Personal use items[1]              | 36,005    | 29,853    |

[1]The revenue agent's calculation did not take into account petitioners' opening inventory in each year, thus understating her computation of petitioners' personal use items by $1,680 and $2,732 for 1998 and 1999, respectively.

The revenue agent then determined the appropriate costs of goods sold by making the following computation:

|                              | 1998    | 1999    |
|------------------------------|---------|---------|
| Beginning inventory          | $1,680  | $2,732  |
| Purchases less withdrawals   | 22,397  | 42,531  |
|                              | 24,077  | 45,263  |
| Less end of year inventory   | (2,732) | (4,220) |
| Cost of goods sold[1]        | 21,345  | 41,043  |

[1]The revenue agent's failure to account for opening inventory in the calculation of items withdrawn for personal use carried over onto her computation of costs of goods sold, causing the figure to be overstated by $1,680 and $2,732 in 1998 and 1999, respectively.

As a result of the examination respondent determined that petitioners had substantially overstated the costs of goods on their Amway Schedules C for 1998 and 1999.  Respondent's examination revealed that, of the $44,745 claimed as cost of goods sold for 1998, only $21,345 could be traced to the generation of receipts from the resale of Amway products, leaving $23,400 in Amway product purchases claimed as cost of goods sold for which there was no record of any proceeds from resale.  For 1999, of petitioners' claimed cost of good sold of $57,145, only $41,043 could be traced to the generation of resale receipts, leaving $16,102 in claimed cost of goods sold for which there was no record of any proceeds from resale.[6]  After a painstaking

_____

[6]As noted, the revenue agent's computations actually understated the value of items withdrawn for personal use in 1998 and 1999.  On brief, respondent makes a correction for the revenue agent's corresponding overstatement of cost of goods sold for 1999 (from $41,043 to $38,311) but he does not do so for
(continued...)

review of petitioners' records, including additional substantiation we permitted petitioners to submit after trial, we agree with respondent's position that petitioners substantially overstated costs of goods sold for each year.

Petitioners' response appears to be that the $23,400 and $16,102 in 1998 and 1999, respectively, of their Amway product purchases for which there are no corresponding resale proceeds represent Amway products that were given away for promotional or training purposes; i.e., as free samples or as "business support" (motivational) materials for their downline distributor recruits, prospective recruits, and/or retail customers. Petitioners also accounted for personal use by excluding $14,800 and $14,418 in 1998 and 1999, respectively, of Amway product purchases from their computation of costs of goods sold, as reflected in the posttrial substantiation they submitted.

We are not persuaded by petitioners' explanation. First, we note that the exclusion of $14,800 for 1998 and $14,418 for 1999 of personal products that petitioners document in their posttrial substantiation is already accounted for in the revenue agent's computation. The revenue agent's starting figures for Amway purchases, $58,402 for 1998 and $72,384 for 1999, closely approximate the results petitioners show in their posttrial

---

6(...continued)
1998.

substantiation for Amway product purchases <u>before</u> exclusion of personal use products, $59,063 for 1998 and $71,024 for 1999. Recognizing the foregoing, we find it difficult to believe that petitioners gave away Amway products totaling $23,400 in 1998 and $16,102 in 1999 (i.e., each year's Amway product purchases that could not be traced to a resale). Accepting petitioners' explanation requires the Court to believe, for example, that they gave away Amway products in excess of gross receipts in 1998. Second, petitioners introduced expense summaries (Exhibit 23-P) indicating that substantial amounts of Amway "business support" materials were <u>sold</u> to their downline distributors, not given away (i.e., $4,680 in 1998 and $14,197 in 1999). Third, Mrs. Campbell admitted in her testimony that she used Amway products in her real estate business to stock model homes and to give in gift baskets to clients, yet the only non-Amway use of Amway product purchases in 1999 that is reflected in petitioners' posttrial substantiation is use in Mr. Campbell's construction business. In sum, while we are persuaded that <u>some</u> portion of the Amway product purchases for which there are no corresponding resale proceeds were given away for promotional or training purposes during the years at issue,[7] we believe such use fell

---

[7]We account for promotional expenses in 1999 by allowing as a promotional expense $4,000 of petitioners' claimed "supplies" expense (which they also explain as attributable to the giveaway of Amway products as free samples or promotional materials for

(continued...)

considerably short of $23,400 and $16,102 in 1998 and 1999, respectively.

Considering all the facts and circumstances, including especially the confusing state of petitioners' Amway records, we conclude that a substantial portion of the costs of goods sold respondent disallowed for 1998 and 1999 represents Amway purchases that petitioners withdrew from inventory for personal use or use in their other businesses. This commingling of the Amway merchandise, resulting in substantial inaccuracies in reported costs of good sold, is further evidence that petitioners' Amway activity was not conducted in a businesslike fashion. It also resulted in petitioners' claiming business deductions for personal expenditures.

Finally, in the face of reporting consistent losses from their Amway activity, petitioners did little to change how they operated the business--except, apparently, reducing the size of free samples given to prospective downline distributors and attempting to increase retail sales. Petitioners had no business plan other than the plan Amway provided. While it is true that petitioners' reported gross receipts grew dramatically during the years at issue, suggesting success in recruiting downline

_____

[7](...continued)
existing or prospective distributors). We note in this regard that "selling expenses" are accounted for in the regulations as business expenses rather than as cost of goods sold. Sec. 1.162-1(a), Income Tax Regs.

distributors,[8] this trend had no significant impact on profitability. Petitioners' reported gross receipts almost doubled between 1999 and 2001, yet their reported losses remained around $20,000 annually. See Ogden v. Commissioner, T.C. Memo. 1999-397 (annual increases in gross income from Amway activity not indicative of businesslike conduct of activity where exceeded by claimed deductions), affd. 244 F.3d 970 (5th Cir. 2001). Mr. Campbell testified that petitioners would stick with the Amway activity even if it never returned a profit. Under these circumstances, it is clear that petitioners did not operate their Amway activity in a businesslike manner. Accordingly, this factor weighs heavily against petitioners.

C. Expertise of Petitioners or Their Advisers

Preparation for the activity by extensive study of its accepted business practices, or consultation with those who are expert therein, may indicate a profit objective where the taxpayer carries on the activity in accordance with such practices. Sec. 1.183-2(b)(2), Income Tax Regs.

Although petitioners have prior entrepreneurial experience and both operated other businesses concurrently, they had no

---

[8]Some of the growth in gross receipts may also be attributable to the fact that petitioners processed through their Amway activity the purchase of supplies and materials for Mr. Campbell's construction business and Mrs. Campbell's real estate business. For example, in 1999 petitioners purchased at least $14,418 of Amway products for the construction business alone.

experience with operating a direct marketing distributorship before they were recruited as Amway distributors. Petitioners obtained advice only from their upline distributors and other interested Amway individuals, persons who had a direct financial interest in the maximization of petitioners' sales volume, without regard to petitioners' profitability. See Ogden v. Commissioner, supra (Amway upline distributors' advice biased in view of financial interest in downline distributor's sales volume). The only disinterested third party with whom petitioners consulted was their stockbroker, who advised them not to become involved in Amway. This factor weighs against petitioners.

D. The Time and Effort Expended by Petitioners in Carrying On the Activity

The fact that the taxpayer devotes much of his personal time and effort to carry on an activity may indicate an intention to derive a profit. Sec. 1.183-2(b)(3), Income Tax Regs.

Both petitioners spent extensive time and effort carrying on the Amway activity. Petitioners went to Amway training functions, participated in counseling sessions with upline distributors, and expended substantial time attempting to recruit new downline distributors. Mrs. Campbell credibly testified that she spent approximately 25 hours on average per week taking and organizing orders from her retail customers and downline

distributors, placing these orders, and distributing the merchandise.

This factor favors petitioners.

E.   Petitioners' Success in Carrying Out Other Similar or Dissimilar Activities

The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit, even though the activity is presently unprofitable.  Sec. 1.183-2(b)(5), Income Tax Regs.

Petitioners had no prior history of engaging in a direct marketing distributorship.  However, both petitioners successfully operated other businesses.  During the years in issue, both Mr. Campbell's construction business and Mrs. Campbell's real estate business had profitable years and loss years.  While the real estate and construction businesses are not similar to an Amway distributorship, we conclude that petitioners' record of at least moderate success in other business activities makes this factor favor petitioners.

F.   Petitioners' History of Income or Loss

A series of losses during the initial or startup stage of an activity may not necessarily be an indication that the activity is not engaged in for profit.  Sec. 1.183-2(b)(6), Income Tax Regs.; see Golanty v. Commissioner, 72 T.C. at 427.  However, where losses continue to be sustained beyond the period which

customarily is necessary to bring the operation to profitable status, such continued losses, if not explainable, may be indicative that the activity is not engaged in for profit.  Sec. 1.183-2(b)(6), Income Tax Regs.  The "goal must be to realize a profit on the entire operation, which presupposes not only future net earnings but also sufficient net earnings to recoup the losses which have meanwhile been sustained in the intervening years."  Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967); see also Nissley v. Commissioner, T.C. Memo. 2000-178.

Petitioners' gross receipts from their Amway activity increased significantly each year in issue, from $19,984 in 1998 to $103,266 in 2001.  Nonetheless, if we use petitioners' reported results, their cost of goods sold always exceeded their gross receipts, and after accounting for operating expenses, petitioners' Amway activity generated annual losses that generally exceeded $20,000, notwithstanding the growth in gross receipts.[9]  Petitioners in this respect are similar to the

---

[9]Petitioners claimed that they had a small profit from their Amway activity in 2002, and they submitted a copy of a Federal income tax return they had submitted to respondent for that year. Because the return was filed late and close to the time of trial, respondent had not yet processed the return.  The return was prepared during the pendency of this proceeding.  We are therefore mindful that petitioners had an incentive to show a profit from Amway for that year in order to bolster their position in this proceeding.  Nothing in the record, other than petitioners' testimony, enables us to determine whether

(continued...)

taxpayers in <u>Ogden v. Commissioner</u>, T.C. Memo. 1999-397.  In <u>Ogden</u>, the taxpayers' Amway activity showed substantial and increasing gross revenue for a period of 3 consecutive years and, in contrast to petitioners' activity, generated small amounts of gross profit (i.e., gross revenue less cost of goods sold). After the <u>Ogden</u> taxpayers' claimed expenses, however, their Amway activity produced losses each year of approximately $20,000, a magnitude similar to petitioners' claimed losses.  We concluded in <u>Ogden</u> that the growth in gross receipts did not support a finding of a profit objective in view of the sustained pattern of losses.  We reach the same conclusion here.  Petitioners' sustained period of losses favors respondent.

Moreover, some of the growth in petitioners' gross receipts is illusory.  Petitioners' Amway gross receipts included their bonus payments, which were boosted by product sales that reflected petitioners' purchase of Amway products for use in their other businesses.[10]  Thus, some of petitioners' increase in gross receipts was due not to their efforts at building their

---

[9](...continued)
petitioners' claimed profit in 2002 is genuine or whether it is a result of their decision to claim fewer expenses.  We therefore decline to make any finding that petitioners' Amway activity was profitable in 2002.

[10]As noted, petitioners recorded $14,418 of Amway purchases for Mr. Campbell's construction business in 1999.

Amway activity but to their decision to use Amway as a supplier of the construction business.

G.   Petitioners' Financial Status

The fact that the taxpayer does not have substantial income or capital from sources other than the activity may indicate that an activity is engaged in for profit.  Sec. 1.183-2(b)(8), Income Tax Regs.  Substantial income from sources other than the activity, particularly if the losses from the activity generate substantial tax benefits, may indicate that the activity is not engaged in for profit.  Id.

Although the profitability of Mr. Campbell's construction business and Mrs. Campbell's real estate business fluctuated, petitioners reported combined profits from the two businesses of $133,075, $63,189, and $3,696 for 1998, 1999, and 2001, respectively, and a combined reported loss of $9,116 for 2000.[11] Petitioners were able to use the reported losses from the Amway activity to offset 29 percent, 38 percent, and 100 percent of their combined income from the real estate and construction businesses in 1998, 1999, and 2001, respectively.  Thus, the tax benefits generated from their reported Amway losses were substantial.  Petitioners' financial status enabled them to

_____

[11]As discussed infra, in the notice of deficiency respondent allowed additional depreciation expense for petitioners' construction business for 2000, increasing the combined loss from the construction and real estate businesses to $12,730.

exploit significant tax benefits from the losses generated by the Amway activity. Therefore, this factor favors respondent.

H. Elements of Personal Pleasure or Recreation

The presence of personal motives in carrying on an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved. Sec. 1.183-2(b)(9), Income Tax Regs.

This Court has observed that "there are significant elements of personal pleasure attached to the activities of an Amway distributorship" and that "an Amway distributorship presents taxpayers with opportunities to generate business deductions for essentially personal expenditures." Brennan v. Commissioner, T.C. Memo. 1997-60. We accept petitioners' testimony that they did not engage in the Amway activity for its social aspects or because their Amway activities afforded them recreational opportunities. Nonetheless, petitioners used their Amway distributorship as a means to generate business deductions for essentially personal expenditures and as a source of discounts on items for personal consumption or use in their other businesses, as illustrated by the extensive disallowances of their claimed deductions, many of which they now concede. For 1999 petitioners' proffered substantiation shows that they deducted, as "legal and professional" expenses of the Amway activity, hay and shoes for their horses. Petitioners concede that the meals

and entertainment expenses they claimed with respect to the Amway activity were overstated by $602 and $803 for 1998 and 1999, respectively. We have discussed previously the inadequate bookkeeping that resulted in petitioners' claiming cost of goods sold for Amway products used for personal consumption or in petitioners' other businesses.

Petitioners' Amway activity enabled them to obtain an extensive range of consumer products for personal use (or other business use) at a discount, including a truck and household appliances. Petitioners were entitled to discounts at several national chain retailers through Amway, including Barnes & Noble, OfficeMax, Craftsman Tools, Circuit City, and Sur La Table. Petitioners' own recordkeeping reflects that $14,800 and $14,418 of Amway products in 1998 and 1999, respectively, was purchased for personal use or use in their other businesses, and we have concluded that additional amounts were used for this purpose and improperly reported as costs of goods sold in those years. Petitioners obtained a further effective discount on these purchases because they boosted petitioners' Amway sales volume for the year, generating additional bonuses. The availability of consumer product discounts for personal use merchandise is a factor supporting the conclusion that Amway distributors lacked a profit objective. See Nissley v. Commissioner, T.C. Memo. 2000-178; Ogden v. Commissioner, T.C. Memo. 1999-397.

These personal aspects are further underscored by Mr. Campbell's testimony that petitioners expected to continue their Amway activity, even if it never returned a profit. See Nissley v. Commissioner, supra (personal dimensions of Amway activity underscored by admission that taxpayers had no intention of getting out of Amway even if it did not turn profitable).

Accordingly, we find that petitioners derived substantial personal benefits from their Amway activity. This factor favors respondent.

I.   Conclusion

Petitioners spent significant time carrying on their Amway activity. Furthermore, petitioners achieved substantial increases in gross receipts from the Amway activity during the years in issue, reflecting some success in recruiting downline distributors, though some of the increase was illusory because it was attributable to their acquisition of Amway products for use in their other businesses and for personal consumption.

However, petitioners did not conduct their Amway activity in a businesslike manner. They usually had no notion of whether the Amway activity had been profitable for a given year until they completed their tax return for that year many months later. They also deducted personal expenses as Amway business expenses. Their recordkeeping commingled costs of Amway products used for personal purposes and in their other businesses with those of

products used in their Amway distributorship to such an extent that their cost of goods sold for each year, and operational results, for the Amway activity were substantially misstated.

Petitioners' substantial use of discounted Amway products in their other businesses and for personal consumption persuades us that the discounts were a principal motivation for petitioners' involvement in the Amway activity. We are likewise persuaded that petitioners' substantial use of the discounts and their commingling of the Amway merchandise in their records indicates that they were largely indifferent to whether the Amway activity, standing alone, produced a profit. We conclude that the benefits of the discounts to their other businesses and of the reduction in their effective tax burden from the Amway losses made petitioners willing to accept losses from the Amway activity indefinitely (as Mr. Campbell testified). In view of the foregoing, petitioners have failed to prove that they carried on their Amway activity with the requisite objective of making a profit. Consequently, their deductions arising from the Amway activity are limited by section 183.

III. <u>Substantiation of Petitioners' Amway Expenses</u>

A. <u>In General</u>

The parties dispute whether petitioners have substantiated many of the expenses claimed for the Amway activity, including cost of goods sold.

For 1998 and 2001 respondent concedes that petitioners have substantiated expenses that exceed their gross income derived from the Amway activity.  We therefore need not address whether petitioners have substantiated any expenses beyond those respondent conceded for those years, because our holding that petitioners' Amway activity was not engaged in for profit precludes any such deductions in excess of gross income derived from the Amway activity.  However, petitioners' claimed Amway expenses that respondent concedes for 1999 are less than petitioners' gross income from Amway in that year.  Accordingly, we must decide whether petitioners have substantiated any Amway expenses for 1999 beyond those respondent conceded.

Petitioners and respondent agree that petitioners had $52,620 of gross receipts from their Amway activity in 1999. Petitioners claimed a total of $86,662 in cost of goods sold and operating expenses for their Amway activity for 1999,[12] but respondent has disallowed $38,410 of the total.  Respondent's disallowances, if sustained in full, would cause petitioners' gross income from their Amway activity to exceed the expenses respondent allowed by $4,368 ($52,620 gross receipts less $48,252 in cost of goods sold and expenses allowed by respondent).  We

---

[12]As compared to the amounts petitioners claimed on their 1999 return, petitioners at trial conceded $2,146 in cost of goods sold and claimed an additional $1,759 and $9,944 in office and supply expenses, respectively.

must therefore decide whether petitioners are entitled to any Amway expenses for 1999 in excess of those respondent allowed. As discussed below, we find that petitioners are entitled to $1,000 in office expense and at least $4,000 in promotional or marketing expense deductions for 1999. We therefore need not address the other disputed items.

Generally, a taxpayer must keep records sufficient to establish the amounts of the items reported on his Federal income tax return. Sec. 6001; sec. 1.6001-1(a), Income Tax Regs. In the event that a taxpayer establishes that a deductible expense has been paid but is unable to substantiate the precise amount, we generally may estimate the amount of the deductible expense, bearing heavily against the taxpayer whose inexactitude in substantiating the amount of the expense is of his own making. Cohan v. Commissioner, 39 F.2d 540, 543-544 (2d Cir. 1930).

B.   Office Expenses

For 1999 petitioners claimed $4,048 of office expenses, $2,289 on their return and an additional $1,759 at trial. Respondent determined that no office expenses were allowable for that year.

Petitioners have offered substantiation of approximately $2,074 of office expenses. They have introduced an exhibit titled "1999 New + original office expense additional", which consists of a handwritten ledger and a summary spreadsheet

purporting to record their Amway office expenses for 1999. Petitioners provided no invoices for any of the listed entries. Consequently, we find petitioners' proffered substantiation insufficient.

Nonetheless, we are persuaded by petitioners' testimony and the record as a whole that their Amway activities, including especially Mrs. Campbell's distribution tasks, were extensive. We are further persuaded that petitioners necessarily incurred office expenses to execute these tasks in 1999. Given the extent of petitioners' distribution network and sales volume, we find a reasonable estimate of their office expenses for 1999 to be $1,000 (approximately $83 per month), and we accordingly allow $1,000 of office expenses for 1999.

C.   Promotional Expenses

Petitioners claimed $9,944 of expenses attributable to "supplies" for their Amway activity, all of which respondent disputes. Petitioners contend that the supplies expense represents free samples and "business support" materials given to their existing or prospective downline distributors.

Petitioners' proffered substantiation of the supplies expense consists of handwritten and computer-generated ledgers purporting to record $6,040 and $3,898, respectively, of Amway products, including training and motivational books, audiotapes, and videotapes, given away as promotional or training materials

in 1999. In many instances, these ledgers record multiple purchases of the same item (which tends to rebut the notion that the items were for personal use). In these circumstances, we find credible petitioners' claim that they gave away at least some significant portion of the items on these ledgers in an effort to recruit downline distributors and encourage existing downline distributors to purchase products and engage in further recruiting. Moreover, respondent has conceded that $16,688 of Amway products was purchased by petitioners in 1999 but not resold. While we have previously concluded that some portion of this $16,688 in Amway products purchased in 1999 represents personal use, we are persuaded that petitioners also gave away a portion for promotional purposes. Considering that petitioners generated $52,620 of Amway gross receipts for 1999, we find that at least $4,000 (approximately 7.5 percent of 1999 gross receipts) constitutes a reasonable estimate of petitioners' promotional expenses for the Amway activity for 1999.

As a consequence of the office and promotional expenses we are persuaded petitioners incurred in their Amway activity for 1999, they have substantiated expenses that are at least equal to their gross income from Amway in that year.

IV. Deductions for Rental Expenses in 1998 and 1999

Petitioners claimed deductions for Schedule E rental expenses of $4,299 and $4,481 for 1998 and 1999, respectively,

for expenses purportedly incurred in renting their unfinished Montana house to Mrs. Campbell's parents.

Section 212 allows a deduction for ordinary and necessary business expenses paid for the production of income or for the management or maintenance of property held for the production of income.  An expense is ordinary if it is customary or usual within a particular trade business, or industry.  Deputy v. du Pont, 308 U.S. 488, 495 (1940).  It is necessary if it is appropriate and helpful for the business.  Commissioner v. Heininger, 320 U.S. 467, 471 (1943).

Petitioners reported $500 of annual rental income in 1998 and 1999 from the Montana house.  Petitioners allowed Mrs. Campbell's parents to use the house for various purposes. Petitioners claim that their rental expenses consisted of cleaning and maintenance of the house, depreciation, and property taxes paid on the house.

Petitioners are not entitled to the claimed deductions. Petitioners provided no documentary evidence to substantiate their claimed expenses.  There is no evidence of their basis in the house to support a depreciation deduction, no evidence of a local tax bill, and no invoice for maintenance or cleaning. Respondent's disallowance of petitioners' claimed rental expense for 1998 and 1999 is sustained.

V.    <u>Net Operating Loss Deduction</u>

Section 172(a) authorizes a net operating loss (NOL) deduction.  An NOL is defined as the excess of allowable deductions over gross income, with specified modifications.  Sec. 172(c) and (d).  The modifications for purposes of computing an NOL include an exclusion of personal exemptions and nonbusiness deductions of taxpayers other than corporations (except to the extent of income that is not derived from a trade or business).  Sec. 172(d)(3) and (4).  Section 172(a) allows an NOL deduction for the aggregate of NOL carrybacks and carryovers to the taxable year.  Section 172(b)(1)(A) generally provides that the period for a carryback is 2 years and that the period for a carryover is 20 years.  A taxpayer may elect to waive the carryback period, but only if he files an election to do so by the due date (including extensions) of the return for the year in which the carryback NOL is generated.  Sec. 172(b)(3).  Otherwise, the NOL must be carried to the earliest of the taxable years to which it may be carried, and it offsets taxable income for that year.  Sec. 172(b)(2).

In general, the taxpayer bears the burden of establishing both the actual existence of an NOL in another year and the amount of that NOL that may be carried to the years in issue. <u>Keith v. Commissioner</u>, 115 T.C. 605, 621 (2000).  We have jurisdiction to consider such facts related to years not in issue

as may be necessary for redetermination of the tax liability for any period before the Court.  See sec. 6214(b).

In the notice of deficiency respondent made a series of determinations concerning petitioners' 2000 taxable year, the result of which was a loss for that year of $38,601, rather than the $60,464 claimed on the return.  The notice determined that, pursuant to section 183, the losses arising from petitioners' Amway activity in excess of the gross income derived therefrom were not allowable, resulting in the elimination of a $25,477 loss claimed.  The notice made no adjustment, however, to the $4,892 loss petitioners claimed with respect to Mrs. Campbell's real estate business.  With respect to Mr. Campbell's construction business, the notice determined that petitioners' claimed loss of $4,224 should be increased by an additional $3,614 depreciation expense that was not claimed on the return. Respondent made no other adjustments, accepting petitioners' claimed itemized deductions and personal exemptions.

The adjustments respondent made in the notice of deficiency concerning petitioners' 2000 taxable year, wherein respondent concedes a $38,601 loss for the year, indicate that petitioners' 2000 taxable year may give rise to an NOL carryback or carryforward to one or more of the years at issue.  Neither party has addressed this issue on brief.  In view of petitioners' pro se status, however, we conclude that it is appropriate, and is a

necessary part of our jurisdiction to redetermine the deficiencies for the years before us, to resolve whether petitioners are entitled to an NOL deduction for any year at issue. We will accordingly direct the parties to address petitioners' entitlement to any NOL from 2000 as part of their Rule 155 computations.

For purposes of the Rule 155 computations, we sustain respondent's determination that the loss petitioners claimed for 2000 from the Amway activity is limited by section 183. For the same reasons discussed in relation to the other years at issue, we conclude that petitioners did not engage in their Amway activity in 2000 with the requisite profit objective and that their deductions are therefore limited to their gross income derived from the activity. Since respondent concedes that petitioners had $83,372 of cost of goods sold in 2000, which exceeded their gross income in that year, it follows that petitioners are not entitled to the $25,477 loss they claimed for 2000 arising from the Amway activity.

In making no adjustment to petitioners' claimed $4,892 loss from Mrs. Campbell's real estate business, and in allowing an additional depreciation deduction of $3,614 on top of the $4,224 loss claimed for Mr. Campbell's construction business, respondent appears to have conceded that petitioners had aggregate Schedule C losses of $12,730 for 2000. Similarly, respondent appears to

have conceded that petitioners had itemized deductions of $20,303 and personal exemptions of $5,600 for 2000.  Together, the foregoing would generate a loss totaling $38,601 for 2000, before the necessary adjustments under section 172(d).

VI.  Section 6651(a)(1) Addition to Tax

Respondent determined that petitioners are liable for an addition to tax for failure to timely file their 1998 return.  Under section 7491(c), the Commissioner has the burden of production with respect to a taxpayer's liability for the section 6651(a)(1) addition to tax.  In order to meet that burden, the Commissioner must offer sufficient evidence to indicate that it is appropriate to impose the relevant penalty.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001).  Once the Commissioner meets his burden of production, the taxpayer bears the burden of proving error in the determination, including evidence of reasonable cause or other exculpatory factors.  Id. at 446-447.

Section 6651(a)(1) provides for an addition to tax for a taxpayer's failure to file a required return on or before the due date, including extensions.  The addition to tax may be avoided if the failure to file was due to reasonable cause and not willful neglect.  United States v. Boyle, 469 U.S. 241, 245-246 (1985).  Reasonable cause exists for late filing if the taxpayer exercised ordinary care and prudence but was nevertheless unable to file on time.  Sec. 301.6651-1(c)(1), Proced. & Admin. Regs.

Illness or incapacity may constitute reasonable cause if the illness causes an inability to file.  Joseph v. Commissioner, T.C. Memo. 2003-19.  However, illness or incapacity does not constitute reasonable cause where the taxpayer has the capacity to attend to other responsibilities.  Wright v. Commissioner, T.C. Memo. 1998-224 ("'selective inability' to file tax returns while attending to other responsibilities does not demonstrate reasonable cause"), affd. without published opinion 173 F.3d 848 (2d Cir. 1999).

Petitioners concede that they filed their 1998 return on October 18, 2000.  Accordingly, respondent has met his burden of production, and in order to avoid the addition to tax, petitioners must show that reasonable cause existed for their failure to timely file their return.  Petitioners argue that they had reasonable cause because their daughter was extremely ill and was giving birth to a child at the time the 1998 return was due.  They contend that their care for their daughter was so time consuming that it was reasonable for petitioners not to file their 1998 return when due.

Petitioners did not testify as to the length of their daughter's illness and did not provide medical records.  However, even accepting that petitioners' daughter was severely ill and that petitioners had to care for her, petitioners have not established that their daughter's illness provided reasonable

cause for not timely filing the 1998 return. During 1999, the year in which petitioners' 1998 return was due, they generated significant income from their construction business and their real estate business. Concurrently, they spent significant time in their Amway activity. Because petitioners were able, despite their daughter's illness, to carry on extensive business activities with significant success, petitioners' contention that they simply did not have time to file their 1998 returns is implausible. See Coury v. Commissioner, T.C. Memo. 2010-132; see also Wright v. Commissioner, supra; Bear v. Commissioner, T.C. Memo. 1992-690, affd. without published opinion 19 F.3d 26 (9th Cir. 1994). We accordingly conclude that petitioners did not have reasonable cause for the failure to timely file their 1998 return. The addition to tax under section 6651(a)(1) determined by respondent is sustained.

To reflect the foregoing,

Decision will be entered under Rule 155.